### In re CAPITAL FOUNDRY CORPORATION.

No. 46229.

District Court, E. D. New York.

Jan. 24, 1947.

Zalkin & Cohen, of New York City, for trustees.

Kommel & Rogers, of New York City, for National Foundry Co. of New York, Inc.

GALSTON, District Judge.

A motion was made by the National Foundry Company of New York, Inc., a creditor of the debtor, for an order requiring the trustees to turn over to the creditor the sum of $2,913.76, as a trust fund. Since the matter could not be determined on the affidavits which were submitted, it was referred to the master for findings of fact and conclusions of law. D.C., 64 F.Supp. 561.

The master filed a comprehensive report in which he concludes that the National could not impress a trust upon that sum of money, and had not proved an equitable assignment of the item of $3,144.90. Whereupon the trustees of the debtor now move for a confirmation of the master's report.

The master found that the debtor, on May 19, 1944, entered into a contract with the Chemical War Service, a division of the War Department of the United States, for the manufacture of nose-body assemblies, machinery and equipment and services in the aggregate sum of $1,171,943.32.

Thereafter the debtor made a contract with the claimant (hereinafter referred to as the National) as a subcontractor for the manufacture of certain component parts.

Before the completion of the general contract, it was terminated pursuant to relevant provisions of that contract, and thereupon the debtor notified its subcontractor, the National, of the cancellation of the subcontract. Both the debtor and the National filed termination claims with the Government.

The claim of National was subsequently allowed in the sum of $42,706.35. It appears also that at or before that time there was a balance due on open account from the debtor to National in the sum of $3,144.90. There was also another claim of Na-

tional of $10,500 against the debtor based on the debtor's alleged refusal to accept certain deliveries before the aforesaid termination of its contract with the debtor. Apparently Captain Calef of the Chemical War Service suggested to National that a settlement be effected under the terms of which National would renounce the latter claim if the debtor could be induced to pay forthwith the amount due on open account.

In passing it should be noted that National's claim against the debtor for refusal to accept certain deliveries before the termination of contract between the parties, did not form a part of the termination settlement. The master found that Captain Calef testified that in respect to the foregoing settlement he called Bagnall, an officer of the debtor, and suggested that the debtor agree to the foregoing settlement. However, the debtor denies having been advised of the alleged claim of National for $10,500. So far as the master's ultimate findings of fact and conclusions of law are concerned, it seems of no moment to determine whether Capital had been advised of the alleged claim of $10,500.

The debtor's agreement was to pay an open account. Thus two checks were drawn, one in the sum of $42,706.35 to the order of the Smaller War Plants Corp. for the account of the National Foundry Company, and one to the Smaller War Plants Corp. for $3,144.90 also for the account of the National Foundry Company, both checks dated December 19, 1944. These checks had to be sent for counter-signature to Chemical Warfare Service, for they were to be paid out of a controlled account into which Chemical Warfare deposited funds against the Government contract with the debtor, and against which deposit checks could be drawn only on the joint signatures of the debtor and the Chemical Warfare Service.

At this point it becomes important to note that on receipt of these two checks from the debtor, Chemical Warfare concluded to withhold them from National, pending the delivery by National of its termination inventory. Nevertheless, yielding to the plea of National that it needed funds, Chemical Warfare did release the check of $42,706.-

35, but withheld as security for the delivery of the termination inventory the check of $3,144.90. This was rather a curious and unusual determination by the Chemical Warfare, since this latter check was in no way related to the termination contract between National and the debtor. It represented solely a payment of open account and it was a mere incident that led to its possession at that time by Chemical Warfare Service. It was within the power of the Chemical Warfare Service to pay over that check to National and to withhold the termination check until the inventory had been delivered, because it was only that check that was related to the termination contract. It should be explained that the reason why a check for $3,144.90 had been made payable to Smaller War Plants Corp., also a Government agency, instead of to National, was because it was an assignee of National on an outstanding loan from Smaller War Plants Corporation to National. Later, National having paid off its debt to the Smaller War Plants Corp., requested that the check held by Chemical Warfare be replaced by one made payable directly to National, and that was done by check dated February 7, 1945.

But on March 3, 1945, after the delivery of this check to Chemical Warfare, and before delivery to National, the debtor filed its petition in this proceeding, and Chemical Warfare properly returned the check to the debtor. At the time the debtor and Chemical Warfare concluded the termination settlement, there was a small balance in favor of the debtor in the amount of $2,913.76, which was paid to the debtor by check some time after the petition for reorganization was filed. It is this check which National claims is a trust fund to be applied to the payment of its claim of $3,144.90.

Article 8 of the supplemental agreement between the debtor and Chemical Warfare provides as follows:

"In all cases where the Contractor has not previously made such payments, the contractor shall, within ten (10) days after receipt of the payment provided for hereunder, pay to each of its immediate subcontractors and suppliers (or to their respective assignees) the respective amounts to which they are entitled, after deducting, if the contractor so elects, any amounts then due and payable to the contractor by such subcontractors and suppliers. If the contractor fails to make any such payment within ten (10) days, the contractor will return to the Government the amount so payable to such immediate subcontractors and suppliers, less any amount then due and payable to the contractor by them."

The master read this provision as creating a trust fund for the benefit of subcontractors. It is not necessary to pass on the question of whether there was thus set up a trust fund for subcontractors, for in the circumstances in this case the check for $3,144.90 formed no part of the termination claim of National, and the clause in question cannot be expanded to include an earmarking of open account indebtedness. The check for $3,144.90 on the open account had been issued by Capital eleven days prior to the date of the supplemental agreement. The finding of the referee that the parties could not have intended to include as beneficiaries of Article 8 subcontractors for whom other provision had been made is sound.

The conclusions of the master that National failed by its proof to establish that a trust fund had been created in its favor upon the $2,913.76, paid to Capital Foundry Corporation in January 1946 by the Government after the petition had been filed herein, and that National likewise failed to prove the existence of an equitable assignment of $3,144.90 on deposit in the controlled account, are supported by the evidence. Accordingly the motion of the National to compel the trustees to pay to it the sum of $2,913.76 is denied, and the report of the master is confirmed.